James C. BECKNELL, Individually and as Trustee of the Linda and Leslie Becknell Trusts, John D. Kettelle, Trustee of the Linda and Leslie Becknell Trusts, Plaintiffs,

v.

Luke W. QUINN, Otter Creek Development Company, Otter Creek Mall, Otter Creek Mall Company, Otter Creek Mall, Inc., M.G. Herring, Jr., Jacque Alexander, Defendants.

James C. BECKNELL and John D. Kettelle, Trustees of the Linda and Leslie Becknell Trusts, Plaintiffs,

v.

FIRST NATIONAL BANK IN LITTLE ROCK, et al., Defendants.

Nos. LR–C–81–500, LR–C–81–645.

United States District Court, E.D. Arkansas, W.D.

Nov. 21, 1983.

Mall, Otter Creek, Inc., and M.G. Herring, Jr.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

The controversy resulting in this lawsuit arises from the operation of a limited partnership known as Otter Creek Development Company (OCDC) organized on June 7, 1971, to own, hold for development, and subsequently develop certain admittedly valuable real estate located at the intersections of Interstate 30 and Interstate 430 in southern Little Rock, Arkansas. The facts in relation to the formation of the partnership and the reasons for its formation are not substantially in dispute.

At the time the limited partnership was formed, two general partners were designated, James C. Becknell, one of the plaintiffs, and Luke W. Quinn, one of the defendants. At the time of its formation, Becknell and Quinn each contributed $100.00 in return for one partnership unit.

As part of its plan of organization, OCDC issued 2,470 partnership units to Becknell's mother, Aileen Becknell, in exchange for 322 acres of land owned by her, located at the intersection of the two highways, and issued 395 units to be divided between Quinn and Edward P. Moore in exchange for 50 acres of land owned by them. Additional units and options to acquire units were issued to certain private investors as limited partners in exchange for cash and promissory notes. By the end of 1971 a total of 5,410 units, including the option units, had been issued.

At the time that the limited partners, also defendants in the case, were allowed to invest in the limited partnership, they subscribed to a total of approximately 2,420 units, but each of them were issued only 50 units in return for $5,000.00 in cash. In addition, these limited partners each had an option to purchase 60 additional units for the same price of $100.00 per unit, or $6,000.00. However, the consideration for the option was $40,000.00, of which $5,000.00 was paid in cash and the balance

Edward F. Mannino, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., W. Dent Gitchel, Little Rock, Ark., for plaintiffs.

George Pike, Jr., Friday, Eldredge & Clark, Little Rock, Ark., for First Nat. Bank in Little Rock.

David M. Powell, Wright, Lindsey & Jennings, Little Rock, Ark., for Worthan Bank and Trust Co.

Richard A. Williams, Mitchell, Williams, Selig, Jackson & Tucker, Little Rock, Ark., for Otter Creek Development Co.

James M. McHaney, Owens, McHaney & Calhoun, Little Rock, Ark., for Limited Partnership defendants.

Daryl G. Raney and Darrell D. Dover, House, Jewell, Dillon, Dover & Dixon, Little Rock, Ark., for Luke W. Quinn.

O.H. Storey, III, Hoover, Jacobs & Storey, Little Rock, Ark., for Otter Creek

of $35,000.00 represented by a promissory note payable $5,000.00 plus accrued interest annually. The options thus purchased by the limited partners could be exercised at any time upon payment of $100.00 per unit, and such payment did not accelerate the balance due on the option note. At the time of their investment, the limited partners were not allowed to purchase only the initial 50 shares, but, instead, were required to also subscribe to an additional 60 units by means of the option described above. The evidence indicated that the plan was developed to make available to the Becknell family certain tax benefits. This arrangement has caused the parties to be in substantial disagreement about where control of the limited partnership was vested at various times during the occurrences which resulted in this dispute.

All witnesses who spoke on the subject at the trial seem to agree that the purpose of the limited partnership, unquestionably, was to own and develop the subject property, and all investors recognized that this would be a long-term investment which might not produce substantial income for the investors for a number of years. Subsequent to formation of the limited partnership and issuance of the shares to Becknell's mother, Aileen Becknell, in 1971 she made a gift of her 2,470 units to two trusts created by her for the benefit of two granddaughters, the daughters of plaintiff, James C. Becknell. Mr. Becknell was named a co-trustee of these trusts.

The partnership was apparently operated without substantial dispute among the investors, with it being utilized for the purposes that all seem to admit that it had until 1979. During that intervening period apparently satisfactory progress was made toward getting the necessary utilities, zoning, and other improvements necessary to make the location attractive as a regional shopping center and other commercial ventures. According to Mr. Becknell's testimony, the split of authority between him and Quinn, the other general partner, was that Quinn was to be responsible for day-to-day operations of the partnership, and Becknell was responsible for long-range

planning. Becknell was an experienced real estate agent, developer and investor in various real estate transactions.

Apparently during the period between the formation of the partnership and 1979, the partnership business progressed smoothly with no substantial dispute either between the limited partners or either of them and other investors. However, in 1975, Becknell had pledged 1,235 units belonging to the trusts of which he was a co-trustee to the First National Bank in Little Rock to secure a loan of approximately $475,000.00 and the remaining 1,235 units to Worthen Bank and Trust Company, N.A., to secure a loan in the approximate amount of $250,000.00. These loans were not made for the benefit of the limited partnership, but the monies obtained were apparently used by him to finance other of his business ventures. The evidence indicated that he was, among other things, an investor in the development of the "Train Station," the refurbishing and attempted use of the old train station in Little Rock for commercial ventures, an undertaking that apparently, to date, has not been profitable.

Both of these loans were renewed and extended by Mr. Becknell numerous times between 1975 and 1979, apparently by payment only of the interest due. Then, in late 1978, it apparently became impossible for Mr. Becknell to even pay the interest and extend the promissory notes. The evidence indicates that both of the banks holding the pledges of the partnership units belonging to the trust cooperated fully with Mr. Becknell in an attempt to help him through the financial problems which were apparently incurred by him. Finally, by letter dated November 28, 1978, First National Bank, through its attorney, advised Mr. Becknell that the indebtedness owed to it by him and various of his controlled entities, had matured on September 1, 1978, and that there was then owed a principal amount of $470,672.88, with accrued interest in the amount of $16,118.93, with additional interest accruing at the rate of $128.95 each day. The letter indicates that

the bank, even then, was attempting to work with Mr. Becknell to see that these obligations were handled in some way most beneficial to him. That letter does not demand that he pay the indebtedness in full. Instead, the letter advises "We have been instructed to advise you that unless you take some action with respect to this promissory note before Tuesday, December 5, 1978, the bank will be forced to liquidate the partnership units in Otter Creek Development Company . . . ."

The evidence shows that Mr. Becknell had, on November 28, 1978, closed a transaction in which he sold his interest in the Train Station. It appears that he had advised officers of at least Worthen Bank, and perhaps also First National Bank, that this transaction would help solve his financial problems. He, however, apparently did not receive sufficient proceeds to pay any portion of either of the indebtednesses owed to the two banks.

In spite of the November 28, 1978, letter, no action was taken by Mr. Becknell to, in any way, resolve the problems caused by the default at First National Bank and a public sale of the partnership units pledged to it was set for November 6, 1979. The evidence indicates that First National continued to work with Mr. Becknell in an attempt to liquidate the indebtedness by other means in order that the partnership units belonging to the trust could be saved. It appears that Mr. Becknell simply could not come up with the money necessary to liquidate this indebtedness nor the Worthen indebtedness. In the meantime, Becknell had moved to Dallas and, according to the testimony of Quinn, at some point prior to the First National Bank sale of the partnership units pledged to it, an officer of the bank, Pat Koch, had advised Quinn of the sale of the partnership units, and Quinn called Becknell and asked him to return to Arkansas to attempt to save the units. According to Quinn, Becknell's reply was that it would do no good because the Arkansas usury law (at that time allowing a maximum interest rate of 10%) "had his hands tied."

During the period that Mr. Becknell's financial difficulties were coming to a head, the limited partnership had dealt, through Becknell and Quinn, with a number of developers in relation to developing the property owned by the partnership. One of those developers was Dean I. Dauley from Grand Prairie, Texas. Apparently, the negotiations with Dauley in respect to development of the property had not progressed to any substantial degree. In fact, the evidence indicates that Quinn had openly expressed the opinion that Dauley had not had the necessary experience to develop a project the size of the one contemplated. On February 5, 1979, one day prior to the date of the announced sale by First National Bank, Becknell obtained an offer and acceptance signed by Dauley, offering to buy what Quinn described as the heart of the property owned by the partnership, outright, for a price of $2,932,000.00. The offer and acceptance was introduced as First National Bank's Exhibit 8, and it is significant to note that it is questionable whether this document binds anyone. It was admitted by Becknell that Dauley paid no consideration for the "agreement," and it is obvious from the face of the offer and acceptance that it is subject to many conditions and that it is, to say the least, not prepared with the specificity which is usually required in order for documents such as this to be binding. In fact, the Dauley offer and acceptance was declared to be "null and void" in a consent judgment entered in another lawsuit in this Court filed by Quinn (LR–C–79–73). This suit was filed on February 19, 1979, and the judgment entered on May 25, 1979.

The offer and acceptance was prepared and apparently signed on the very eve of the scheduled sale of the First National Bank units to be held on February 6. Then, the same day that the document was allegedly executed by Dauley, Becknell and Charles D. Matthews, a Little Rock attorney who, among others, had represented Becknell on his various ventures, and, at the time, a co-trustee of the Becknell trusts, filed suit as plaintiffs against First National Bank in the Chancery Court of

Pulaski County, Arkansas, asking the Court to enjoin the defendant from selling the partnership's shares and alleged as a reason for the injunction the claimed deal with Dauley. The matter was heard by the court on February 6, 1979, and by order dated and filed February 9, 1979, the Chancery Court concluded that the sale of the partnership shares had been previously agreed to by Becknell and that, for this reason, the court had no authority to enjoin the sale, and the complaint was dismissed with prejudice. Apparently because of the lawsuit, the sale previously scheduled for February 6 was continued to February 13, 1979, by agreement of the parties.

The letter agreement which the Chancery Court referred to in ruling on the request for an injunction was a letter dated January 4, 1979, signed by Patrick C. Koch, Senior Vice President of First National, and approved by Becknell and Charles D. Matthews, trustees of the Becknell trusts. The letter was offered by plaintiffs and received in evidence as Plaintiffs' Exhibit 4 and, although the exhibit received was not signed by Matthews and Becknell in the place designated for their signatures, they agreed at the trial that the letter correctly sets forth the agreement reached. In that letter agreement, the parties agreed:

1. A public auction of the partnership units will be held Tuesday, February 6, 1979 at 10:00 a.m. in the Commercial Loan Department at First National Bank in Little Rock.

2. Terms of the public auction are that a minimum bid will be established, that payment must be in cash at the conclusion of the sale, and that the Bank reserves the right to withdraw the partnership units from public auction, in its sole discretion.

3. The Bank will notify limited partners of Otter Creek Development Company, by letter sent U.S. Certified Mail, return receipt requested, that the partnership units are being offered for public sale. This notice will be dated at least 30 days prior to the day of the public sale.

4. You are not requiring the Bank to advertise the public auction in any newspaper or other medium, but you are reserving the right to advertise the partnership units for sale in such manner as you deem necessary.

5. A private sale of the partnership units may be negotiated prior to the public sale and, if the terms of the private sale are satisfactory to the Bank, the public sale will be cancelled. If otherwise, the public sale will be held.

6. It would be appreciated if you would indicate your approval of the foregoing by executing the original and two copies of this letter which have been enclosed.

In spite of the letter agreement, and in spite of the adverse ruling by the Chancery Court of Pulaski County, Mr. Becknell's attempts to thwart the First National Bank sale then scheduled for February 13 were not finished. During the evening hours of February 12, 1979, Charles D. Matthews, as indicated, one of Mr. Becknell's attorneys, and a co-trustee at the time, claimed to have held a partnership meeting at which he voted, "as the disinterested trustee," the 2,470 shares owned by the Becknell trusts in favor of the Dauley sale. It is significant that beginning at 5:00 p.m. on that date, there had been a meeting of the partners to discuss the First National Bank sale the next day, and, in spite of this, Mr. Matthews admitted during his testimony that, although he attended the meeting, he did not disclose to the other partners that there would later be an attempt to approve the Dauley transaction. In any event, Matthews admitted, during his testimony, that he, in effect, held a meeting with himself and, in behalf of the Becknell Trust, approved the Dauley sale. There was admittedly no notice to the remaining partners of the meeting, and no one attended other than, perhaps, Matthews' secretary. Then, the next day, Becknell, through his attorneys, attempted to have First National again delay the sale, claiming that it should do so because of the Dauley transaction.

The bank officers, recognizing that Dauley had offered only to buy real estate, which it did not have the right to sell, and further recognizing that there was a bona fide dispute between the partners as to whether the Dauley transaction had been properly approved, declined to again delay the sale, and the sale was held.

There were no bids for the 1,235 units to be sold by it, and it purchased the units for the amount of the indebtedness, plus expenses, for a total amount of approximately $525,000.00.

There is little question but that the terms of the letter agreement referred to above dated January 4, 1979 (Plaintiffs' Exhibit 4), had been complied with by the bank. All limited partners had been notified of the sale as required by paragraph 3 of the letter agreement and, even though not required, the bank had published legal notices in relation to the sale in the Arkansas Democrat and the Arkansas Gazette, newspapers with general circulation throughout Arkansas and in adjoining areas of contiguous states. In addition, the evidence is clear that the bank kept Becknell and his attorneys, Charles D. Matthews and John Bilheimer, very adequately advised of its intentions and gave Mr. Becknell and his attorneys ample opportunity to make any suggestions or demands in relation to the sale. None, other than those codified in the January 4, 1979, letter, was made.

Mr. Becknell, with over 15 years experience in dealing with matters involving the development of real estate, testified that he knew the real estate people in the area that might be interested in developments and also knew security dealers and was regularly in touch with developers of property. In spite of this, his testimony was that he did nothing to seek buyers for the units at either the First National Bank or Worthen sale. Although he had been in touch with both Williams Brothers, an Oklahoma developer, and Dauley about developing the property, he testified that he notified neither of the date of the First National sale. Instead, all that he did was attempt to block the sale by means of the Dauley deal

discussed above. He admitted that the date of February 12 for the Dauley offer and acceptance (one day previous to the scheduled sale) was more than a coincidence.

First National Bank, having purchased the units, held them until March of 1979 when they were sold to Dr. Philip James Deer, Jr., an ophthalmologist, and one of the limited partners, for approximately $545,000.00. Dr. Deer purchased the shares as "agent," and subsequently some but not all of the remaining limited partners purchased a pro rata portion of the shares.

During the same period that Becknell's financial difficulties caused the First National default, he was unable to pay the interest on the Worthen loan. Again, the evidence indicates that Worthen had worked with him over a number of years and had extended the loan numerous times, again usually if not always upon payment of interest only. Becknell testified that he had no quarrel with the way Worthen had treated him, up to the time that the shares were sold. When it became obvious to Worthen officials that Becknell would not be able to meet the obligations imposed by the Worthen loan, or even pay the interest, he was written a letter dated January 13, 1979, signed by Worthen's attorney, advising that the bank would proceed against the makers and guarantors of the note unless arrangements were made immediately to pay the note in full.

Subsequently, Thomas Wray, a Worthen loan officer, advised Becknell and Matthews, co-trustees, that the sale of the 1,235 partnership units pledged by Becknell to secure the Worthen loan would be held on March 21, 1979. Again, the evidence is clear that Becknell and his lawyers were kept advised of the bank's intentions in this regard and they were invited to make any suggestions and to produce any interested bidders. For example, by letter dated March 5, 1979 (Plaintiffs' Exhibit 23), the bank's attorney advised Becknell and co-trustee, Attorney Matthews, that the partnership units would be sold on March 21,

1979, and that "the trust may redeem the partnership units by paying the amount due and unpaid on the loan obligations, plus fees and expenses, at any time prior to the time of sale." In addition, the letter stated:

> We solicit your comments and suggestions on the sale, particularly with regard to qualified persons who may be interested in acquiring these units. In addition to notifying existing limited partners, we plan to advertise the sale in the *Arkansas Gazette* and the *Arkansas Democrat,* and, most likely, the regional edition of *The Wall Street Journal.*

Subsequent to receiving that notice, attorney and co-trustee Matthews, by letter dated March 19, 1979 (Defendant Worthen's Exhibit 2), acknowledged receipt of the notice and stated:

> By this communication I would like to inform the Bank that while we will interpose no objection to the sale, we do specifically reserve our rights of redemption to these 1,235 partnership units of the Otter Creek Development Company which we intend to exercise, however, only depending upon the price which the partnership units bring at the sale.

In compliance with the terms of the March 5, 1979, letter, the bank advertised the sale in the Arkansas Gazette, Arkansas Democrat, and Wall Street Journal (Plaintiffs' Exhibits 24, 25 and 26). In addition, Worthen gave notice to each of the limited partners (Defendant Worthen's Exhibit 3) who, in the Court's view, certainly by this time, in view of the state of the partnership, represented about the only market for the partnership units. As indicated, neither Becknell nor either of his attorneys, Charles Matthews or John Bilheimer, made any suggestions in relation to the sale and apparently made no attempt to contact interested bidders. A number of apparently interested persons attended the sale, including Attorney Bilheimer. At no time during the sale did Bilheimer protest the procedures followed and he unequivocally stated that he was not authorized to make any bids or to attempt to effect redemp-

tion. Sixteen bids were received and the units were sold to the highest bidder, Dr. Deer, for approximately $328,000.00, which was over $59,000.00 in excess of the amount owed the bank, including interest and expenses. A cashier's check was subsequently tendered to Becknell in the amount of $59,146.89, and it was endorsed by him, cashed, and the proceeds retained by him. Some but not all of the other limited partners purchased from Deer, pro rata, the shares purchased at the Worthen sale by him.

Becknell not only cashed and received the funds from the excess received at the Worthen sale, neither he nor his attorneys in his behalf took any action in relation to either of the sales until well over two years after the Worthen sale. On July 27, 1981, Becknell, in behalf of the trusts, filed suit in this Court (James C. Becknell, et al., v. Luke W. Quinn, et al., LR–C–81–500). In that suit he named as defendants Quinn, Otter Creek Development Company (the partnership), Otter Creek Mall, Otter Creek Mall Company, Otter Creek Mall, Inc., and M.G. Herring, Jr.

All of these defendants, with the exception of Luke Quinn and OCDC, were entities formed for the purpose of developing a large shopping center on the property owned by OCDC. Prior to and during the period when the financial difficulties of Becknell arose, Becknell and the other general partner, Quinn, had received proposals from four national shopping center developers for the development of a regional shopping center on the land owned by OCDC. With the assistance of a consultant from Chicago, it was recommended by Quinn, apparently without specific objection from Becknell, that the proposal of Paul Broadhead and Associates, Inc., be accepted. At a March 5, 1980, meeting of the partners, not attended by Becknell but attended by his attorney, Bilheimer, the limited partners, in person and by proxy, unanimously approved the Broadhead proposal.

The agreement with Broadhead provided that, within nine months, the Broadhead

interests would designate, with the approval of OCDC, up to 120 acres (out of the approximate 800 acres owned by OCDC) as the exact site of the regional shopping center. The time interval was specified to permit engineering studies to be made and to allow OCDC to obtain the release of a mortgage on the proposed site. Although neither Becknell nor anyone acting in his behalf objected to the arrangement with Broadhead, nor to the site selected, when a deed conveying the shopping center site to one of the Broadhead entities was sent to Becknell, it was not signed and returned by him, although he had earlier signed and returned to Quinn a new mortgage replacing the one that was released to carry out the agreement between the Broadhead interests and the partnership.

During this period, according to Quinn, he had several telephone conversations with Bilheimer and, on each occasion, he was firmly assured by Bilheimer that Becknell would sign the deed and return it to him. This testimony is, to a substantial degree, confirmed by Bilheimer's handwritten note which was attached to a letter dated June 4, 1981 (Defendant Quinn's Exhibit 3), addressed to the partnership's attorney, Richard Williams, a copy of which was hand delivered to Quinn. Attached to Quinn's copy was Bilheimer's handwritten note which stated, among other things, "There has been a fair amount of dissembling and misleading on my part, as is obvious from this letter, although not as much as it looks like. In any case, however, I owe you an apology. Please give me a call some time in the next few days—maybe after you and Dick have had a chance to get mad and cool off."

The letter to Williams, to which the handwritten note referred, advised that Becknell had decided not to sign the deed. He then filed Case No. LR–C–81–500, referred to above. That case was originally assigned to Judge Overton, then to Judge Woods, and finally to Judge Eisele. All defendants filed answers and counterclaims, with the entities formed to develop the shopping center counterclaiming for damages against the plaintiffs for interference with their contractual relationship with the limited partnership. The limited partnership (OCDC) counterclaimed for injunctive relief against interference by Becknell with the development of the project. In essence, the relief sought by Becknell was to prohibit the development of the property by the Broadhead interests.

On October 21, 1981, Judge Eisele sustained a motion for summary judgment filed by the defendants on the grounds that all of the limited partners who held options to acquire additional partnership units had exercised those options on October 8, 1981, and thereby acquired a majority of the total units outstanding without considering the question of who legitimately owned the 2,470 shares obtained through the foreclosure sales. Again, on the same date, the limited partners again unanimously ratified in writing the conveyance of the property so that the shopping center development could proceed.

Before Judge Eisele granted a summary judgment in LR–C–81–500, Becknell and his co-trustee, on September 14, 1981, filed their complaint in this action and on October 5, 1981, filed an amended and substituted complaint seeking certain specified relief against the two banks, each of the limited partners, Otter Creek Development Company, M.G. Herring, Jr., and the entities formed to develop the shopping center. Prior to trial, the complaint as it relates to Herring and the entities formed to develop the shopping center was dismissed.

All of the judges for the Eastern District of Arkansas, for one reason or another, recused and the case was assigned to this Court.

In the complaint, and prior to and during the trial, the plaintiffs made serious allegations in relation to the conduct of each of the defendants. Their claims, the Court believes, were best set forth in their pre-trial conference information sheet filed pursuant to Rule 21 of the Rules of the United States District Courts for the Eastern and Western Districts of Arkansas as follows:

7. STATEMENT OF FACTS

Plaintiffs are co-trustees of the Linda and Leslie Becknell Trusts. These Trusts were created by Aileen Becknell, who donated the land held by Otter Creek in return for 2470 Limited Partnership units in Otter Creek.

In May, 1977, the Trusts borrowed $250,-000.00 from Worthen secured by 1235 limited partnership units in Otter Creek ("the second lot"). This loan was renewed and extended on numerous occasions.

In July, 1978, the Trusts, represented by Becknell and Charles Matthews, who preceded plaintiff Kettelle as co-trustee, obtained a loan from FNB for approximately $470,000.00 for which they pledged 1235 units in Otter Creek ("the first lot") as collateral. The Trustees, unable to repay the loan when it fell due in September, 1978, were advised by FNB that the first lot would be sold at a foreclosure sale. The Trustees objected to this proposed sale.

In December, 1978, Richard A. Williams ("Williams"), counsel for Otter Creek, advised Paul B. Benham, III ("Benham"), counsel for FNB, that special efforts should be made to establish a fair price for the first lot and offered to assist Benham in establishing such a price. Significantly, three of Benham's law partners were also limited partners in Otter Creek.

By letter dated January 4, 1979, the Trustees and FNB, agreed, *inter alia*, that a "public auction" of the first lot would be held on February 6, 1979; that a "minimum bid" would be established; that FNB would reserve the right to withdraw the units from the public sale; that FNB would be required to notify the limited partners of Otter Creek of the proposed sale but would not be required to place newspaper advertisements of the proposed sale; and that the Trustees would be free to negotiate a private sale of the first lot. The sale was then postponed until February 13, 1979.

On November 28, 1978, Worthen Bank declined to extend its loan to the Trustees. By letter dated January 31, 1979, Worthen's counsel sent a demand letter to the Trustees requesting prompt payment of the loan. However, the Trustees were assured that no foreclosure sale would be held if repayment of the loan were arranged.

Acting in reliance upon, *inter alia*, the foregoing agreements, Becknell, in his capacity as a General Partner of Otter Creek, negotiated a private sale of a portion of the Otter Creek lands to Dean I. Dauley ("Dauley"), a developer headquartered in Dallas, Texas, which would have produced substantial cash ($2.9 million) for the limited partnership sufficient to repay the FNB and Worthen loans and to make a substantial distribution to the Trustees.

On February 12, 1979, Becknell entered into an agreement with Dauley to sell the lands. This sale was properly ratified by a majority of the limited partnership units of Otter Creek. The Trusts' units, representing over 60% of the outstanding limited partnership units at that time, were properly voted by Matthews, the disinterested Trustee.

The limited partners, however, recognizing that development of the Otter Creek lands was imminent, began a series of contacts with FNB and formulated a scheme with FNB, acting through Benham, his law partners (who were also Otter Creek limited partners), Patrick K. Koch ("Koch"), Senior Vice President of FNB, and others, to frustrate the Trustees' efforts to sell the lands and to acquire the first lot for the limited partners themselves at a ridiculously low price. In pursuing this scheme, the limited partners employed several devices. First, orchestrated by Luke Quinn, a limited partner in Otter Creek who was also the second General Partner, the limited partners began a campaign of misrepresentations. Specifically, the misrepresentations included: (1) statements to Dean Dauley that the sale to him was not ratified by the limited partnership; (2) statements to John Bilheimer, Esquire, counsel for the Trustees, that the Trusts did not hold a majority of the limited partnership units in Otter Creek, and therefore could not have properly ratified the sale; and (3) statements to the banks that the sale was not properly

ratified by the limited partnership. Moreover, defendant Quinn instituted an action in federal court to void the agreement with Dauley, who consented to rescission of the contract based on the limited partners' misrepresentations. At the same time they were upsetting the Dauley sale through their misrepresentations, the limited partners were continuing their machinations with FNB to ensure that the foreclosure sale would be consummated before the Trustees could arrange to repay the loan and/or redeem their units.

Despite the fact that the Dauley sale would have assured that its loan would be repaid in full, FNB incredibly refused the Trustees' request to cancel the foreclosure sale. Since the Dauley sale would have provided total compensation at no risk to FNB, there was no business justification for FNB's refusal.

Despite another request by Bilheimer, the Trustees' attorney, to cancel the foreclosure sale, FNB nonetheless proceeded with the sale in order to pave the way for the limited partners to carry out the scheme of purchasing the first lot at a price far below its fair value. In their haste to hold the foreclosure sale before the Trustees could consummate the Dauley sale and arrange repayment of the loan or redemption of the limited partnership units, FNB totally ignored the debtor's right to have the sale conducted in a commercially reasonable manner. FNB made no effort to solicit Dauley or Williams Realty Company, another potential buyer known to FNB, or in fact any sophisticated bidders who would be in a position to recognize the value of the units; no bidders appeared at the sale; and FNB purchased the first lot for approximately $525,000.00—the exact amount of the FNB loan plus interest and expenses. This was highly prejudicial to the Trustees, who had relied on FNB's misrepresentation that it would allow the Trustees to negotiate a private sale.

At or shortly after the sham foreclosure sale, Benham, on behalf of FNB, informed Bilheimer, the Trustees' counsel, that FNB would offer Becknell the opportunity to repurchase the first lot; however, on or about March 20, 1979, defendant limited partners, pursuant to their prearranged scheme with FNB, secretly purchased the first lot at a price not significantly greater than $525,000, the amount of FNB's *pro forma* bid and significantly less than the $2.9 million which Dauley would have paid for the land. Significantly, this occurred only days before the scheduled Worthen foreclosure sale, at which the limited partners felt assured of acquiring the remaining units held by the Trusts through a purchase by limited partner Philip Deer. Despite Benham's promise that Becknell would have the opportunity to repurchase the units, Becknell was never informed of the proposed private sale and, in fact, never learned of the sale until several weeks after it had been concluded.

Having successfully thwarted the Dauley sale through their illegal actions and having acquired half of the Trustees' units by fraudulently manipulating the foreclosure sale and purchasing the units far below their fair value (with the help of FNB, who ignored its legal obligation to conduct a commercially reasonable sale), the limited partners turned towards obtaining the remaining 1235 units held by the Trustees. Since two of the limited partners were on the Board of Directors of Worthen, they were well aware that these remaining units were held as collateral by Worthen for a loan which was currently in default.

After Worthen had sent its demand letter, other limited partners in Otter Creek began a series of contacts with Worthen. These limited partners, realizing that development of Otter Creek lands was imminent, formulated a scheme to acquire the Trustees' limited partnership units for only a fraction of their fair market value. In fact, the limited partners were aware that negotiations were taking place with mall developers. Worthen was an integral part of that scheme, since the limited partners intended to acquire these units by purchasing them at Worthen's foreclosure sale.

The limited partners quickly conveyed the misrepresentation to Worthen that the

Dauley sale had not been properly ratified and would not be closed. Worthen promptly scheduled a foreclosure sale for March 21, 1979. Worthen, with full knowledge of the limited partners' fraudulent and manipulative conduct, pressed ahead with the foreclosure. At that point, the Trustees did the only thing they could do to protect their investment. They reserved their rights of redemption and advised Worthen that, consistent with applicable laws, special steps would have to be taken to find appropriate buyers who would appreciate the value of these units.

In order to fully apprise Worthen of the value of these units, James Becknell provided the bank with an appraisal of the Otter Creek property. The appraised value of the partnership property was $6,824,-000.00. Since the pledged units held by Worthen represented approximately 32% of the partnership at that time, their value was approximately $1.8 million.

Worthen represented to the Trustees that it would carry out its fiduciary obligations in properly handling their units held as collateral, and would not accept any bid which did not represent a fair price. However, this behavior was all a sham. Prior to the sale, Tom Wray ("Wray"), a Vice-President of Worthen, received a call from defendant Quinn, who stated that the limited partners were interested in the units. Despite knowing of the interest of competing bidders, Dauley and Williams Realty Company, Worthen made no effort to contact them. Moreover, although Wray denied informing anyone of the exact amount of the loan plus interest and costs, limited partner Deer, who purchased the units and subsequently resold them to the other limited partners, came to the foreclosure sale with a cashiers' check in an amount only slightly more than the loan plus interest and costs.

The purported efforts of Worthen Bank to solicit bidders were, in actuality, worthless, and part of the scheme to get the units to the limited partners at a sham foreclosure sale. For example, the small type, buried newspaper advertisements placed by Worthen are obviously useless in attracting the sophisticated real estate investors who would appreciate the value of these units. Moreover, Worthen only notified the limited partners to implement the conspiracy, and the exact price had already been prearranged, as evidenced by the fact that Deer came to the sale with a cashiers' check from FNB in an amount only slightly higher than the loan plus interest and costs.

The foreclosure sale took place on March 21, 1979. In fact, no sophisticated bidders had been solicited. The bidding was a mere formality, and the units were purchased for $328,000 by Deer and then resold to the other limited partners. The scheme had been planned so effectively that even the possibility of competitive bidding between the limited partners had been eliminated. The $328,000 received was less than 20% of the fair value of the units.

Because of the conduct of the various defendants in this action, the Trustees were not able to redeem their units. Worthen's loan was repaid in full, as it would have been anyway. But the limited partners, many of whom had various connections with Worthen Bank, had fraudulently obtained the Trustees' units for less than the 20% of their fair market value through the help of Worthen.

This case was tried to the Court without a jury on September 12, 13 and 14, 1983. At the conclusion of the trial, the attorneys for the parties were directed to file briefs and proposed findings of fact and conclusions of law. These have been received and considered by the Court, and the Court is now prepared to rule.

In their brief filed in this matter, the attorneys for the plaintiffs argue that the Court should find:

A. FNB failed to fulfill its obligation to conduct a commercially reasonable foreclosure sale of the units.

B. Worthen failed to fulfill its obligation to conduct the foreclosure sale in a commercially reasonable manner.

C. The limited partners are liable to plaintiffs for their collusive agreements not to bid at the FNB and Worthen sales.

D. Defendants FNB, Worthen and the limited partners are liable to plaintiffs under section 10(b) and Rule 10b–5.

E. Plaintiffs have been damaged in the amount of $3,268,013.60, or in the alternative, in substantial lesser amounts.

In the amended and substituted complaint filed in this matter on October 5, 1981, the plaintiff, then represented by different counsel, did not allege or seek damages, but, instead, in a complaint consisting of nine separate counts and 35 pages, not including exhibits, prayed that the Court enter an order rescinding the foreclosure sales and transfers of the units as the result of such sales and that the Court declare null and void all actions purportedly approved by a majority of the holders of limited partnership units from February 13, 1979, to date, and that the Court enjoin all future actions so approved by the partnership until rescission of the sale and resale of the units transferred by means of the two foreclosure sales. The complaint sought an order of the Court returning to plaintiff the title to such units, free and clear of any liens or encumbrances. Exemplary damages, costs and attorneys' fees were sought. In addition, the complaint seeks an order of the Court declaring null and void and rescinding the conveyance from OCDC to the entity formed to develop the shopping center under the agreement with the Broadhead interests, and voiding the action taken by the limited partners in removing Becknell as general partner and replacing him with defendant Deere.

It is plaintiffs' position that, even though they failed to seek damages in their complaint originally filed, they are still entitled to an award of damages. The defendants contend otherwise, but because the Court firmly believes that the plaintiffs have fallen woefully short of proving the serious allegations which have been made in this lawsuit, the Court finds that it is not necessary to determine that issue.

## COMMERCIAL REASONABLENESS OF FIRST NATIONAL BANK AND WORTHEN SALES

In relation to the First National Bank sale, plaintiffs argue that since First National purchased the units for the exact amount of its loan plus interest and costs, strict scrutiny of the procedures employed in connection with the sale are mandated and that when that scrutiny is given, the sale must be determined to be commercially unreasonable. The Court disagrees.

The plaintiffs recognize that the controlling law is contained in section 9–504(3) of the Uniform Commercial Code as enacted in Arkansas. ARK.STATS.ANN. § 85–9–504(3) states in pertinent part:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

ARK.STATS.ANN. § 85–9–507(2) states: The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.

As pointed out in Clark, *The Law of Secured Transactions*, ¶ 4.8[5] at 4–46 (Warren, Gorham & Lamont 1979):

Even though both versons [sic] of ¶ 9–504(3) contain several flat rules—such as the requirement of notice and the prohibition against the secured party's bidding in at a private sale—the polestar is "commercial reasonableness." The litigation indicates that, for the most part, whether a disposition is commercially reasonable will turn on the facts of the individual case, with many factors involved.

As plaintiffs' attorneys correctly point out, what constitutes a commercially reasonable foreclosure sale depends upon a

variety of factual considerations. As they also correctly point out, one of the most crucial of these considerations is the price obtained at the sale. They rely heavily on the decision of the United States Court of Appeals for the Eighth Circuit in *United States v. Conrad Publishing Company*, 589 F.2d 949 (8th Cir.1978), and of the district court in *Connex Press, Inc. v. International Airmotive, Inc.*, 436 F.Supp. 51 (D.D.C.1977), *aff'd*, 574 F.2d 636 (D.C. Cir.1978).

■ However, the law clearly is, as *Conrad, supra*, points out, whether a sale was conducted in a commercially reasonable manner is a fact question to be determined from the facts of the particular case under consideration. Simply because a particular court, under the facts of that case, decided that a particular sale was commercially reasonable or unreasonable is not, standing alone, particularly instructive. A reading of these cases does little more than set forth certain principles that aid in guiding the Court to, hopefully, the proper conclusion after a consideration of the facts of the particular case. For example, plaintiffs have pointed to cases which hold that a significant discrepancy between sale price and fair market value signals a need for "close scrutiny of the procedures employed at the sale." *Connex, supra; Associates Capital Services Corp. v. Riccardi*, 454 F.Supp. 832 (D.R.I.1978); *Leasing Service Corporation v. Broetje*, 545 F.Supp. 362 (S.D.N.Y.1982).

On the other hand, defendants have pointed to a number of cases construing the Arkansas provisions of the Uniform Commercial Code that hold that the mere fact that a better price could have been obtained does not indicate that the sale was not commercially reasonable. *Piper Acceptance Corporation v. Yarbrough*, 702 F.2d 733 (8th Cir.1983); *Goodin v. Farmers Tractor & Equipment Co.*, 249 Ark. 30, 458 S.W.2d 419 (1970); and *In re ZsaZsa Limited*, 352 F.Supp. 665 (S.D.N.Y.1972). As defendants pointed out, in the last cited case the United States District Court for the District of New York, a jurisdiction heavily involved in commercial transactions, found that a sale of inventory for $300,000.00 was not commercially unreasonable despite evidence that the estimated retail value was $3.5 million and the estimated wholesale value was $1.5 million and the cost value was $500,000.00.

In short, the Court believes that it is its duty, obligation and burden to view the facts in this case with the principles discussed above in mind, and to determine whether, under the factual situation present, the sales of both First National Bank and Worthen were commercially reasonable.

■ The Court believes and finds that, under Arkansas law and the law of other jurisdictions, when a debtor proceeds against a secured party challenging the commercial reasonableness of a default sale, the debtor has the burden of proving the secured party's failure to proceed pursuant to the Code. *Goodin v. Farmers Tractor & Equipment Co., supra; Dulan v. Montana National Bank of Roundup*, 36 UCC Rep. 346, 661 P.2d 28 (Mont.S.Ct. 1983); *First National Bank & Trust Co. of Enid v. Halston*, 20 UCC Rep. 1124 (S.Ct. Okla.1976); *Pruske v. National Bank of Commerce*, 533 S.W.2d 931 (Tex. Civ.App.1976). *Cf., Bank of Josephine v. Conn.*, 599 S.W.2d 773 (Ky.App.1980), 28 UCC Rep. 1226; *Chittenden Trust Co. v. Maryanski*, 415 A.2d 206 (Vt.1980), 28 UCC Rep. 1237. The Court believes and finds that the plaintiffs have failed to carry the burden imposed.

■ It should be remembered that the plaintiff does not contend that the notes by means of which he obtained funds for his personal use and pledged partnership units belonging to the trusts for which he was a co-trustee were not in default at the time that the two banks foreclosed. On the contrary, he admits that the banks worked with him over a long period of time and that they converted their security to cash only when he was no longer able to even make the interest payments called for. He also admits that he and his attorneys were kept advised of the intentions of the banks

and, in each case, they gave him ample time to not only make arrangements to pay the notes, but to make any suggestions that he deemed appropriate in relation to the sales and to produce any interested bidders. It should be remembered that Mr. Becknell was not, by any means, a "babe in the woods." He had been involved in developing lands in the Little Rock area for, according to his testimony, in excess of 15 years, and was, at the time, involved in development of a large development known as the Train Station, a project which apparently contributed to his financial difficulties. He testified that he knew and was in contact with developers around the country who developed projects such as this one, but, in spite of this, he made no attempt to have any of those persons present at either of the sales. The Court recognizes that that fact is interwoven to some extent with the question of whether his conduct constituted a waiver of the commercial reasonableness requirement, but the Court believes that it also indicates that Mr. Becknell, a man of vast knowledge and expertise in matters such as this, recognized that the manner in which the banks were proceeding was about as good as could be done under the circumstances. The Court believes that his action in this regard is evidence that this is the case.

Becknell argues that the purchase price obtained at either of the sales was substantially less than the fair market value, but his basis for contending this is that the lands owned by the limited partnership were quite valuable. It is true that they were, but Mr. Becknell's simple mathematical calculation to arrive at the value of the partnership units by using the value of the underlying land is fallacious not only in concept but in practice. As Mr. Koch of the First National Bank recognized, neither of the banks had any land to sell. Instead, what they had to sell was partnership units in a partnership which anyone in the Little Rock area and probably anyone who was knowledgeable in matters such as these would readily recognize was in a state of disarray caused largely by Mr. Becknell's actions. Not only did each of the banks

have only partnership units in a partnership torn by strife and disagreement to sell, they had what was, under any interpretation of the facts, a minority interest. There was a great deal of argument at the trial whether the Becknell Trusts owned less than 50% of or in excess of 60% of the voting units. The answer to that question turns on whether the options which the limited partners had a right to exercise at any time by payment of what was undoubtedly to them a nominal sum in view of the investment they already had in the partnership were to be considered in determining control. The Court finds that whether, at the time of the First National and Worthen sales, the Becknell Trusts owned more than 50% of the voting units, or whether they did not, is not important in determining the issues to be determined in this case. Irrespective of which of the views is accepted, there is little question but that when First National Bank sold the shares pledged to it on February 13, 1979, all that any purchaser at that sale had any assurance of obtaining was 1,235 units which, even under Becknell's interpretation, would be 30% or less of the total voting units. Likewise, when the Worthen sale was held, no one bidding at that sale could be certain, not even Dr. Deer who had purchased the earlier units from First National Bank, that those units could be acquired, at least at a reasonable price, so what any bidder at either of those sales would had to have taken into account was that if the units were bought at either of the sales, the purchaser would acquire a 30% interest in a partnership in which the principals were in clear disagreement as to the policies that should be followed. They would have to recognize that Mr. Becknell, by his actions, attempted to sell to Dauley the fee simple title to the very heart of the property which the partnership was formed to develop, a venture that was, by agreement of all of the parties, to be a long-range investment.

■ What was the fair market value of the 1,235 partnership units at the time First National sold them on February 13,

1979? It was clearly what a willing purchaser under no compulsion to purchase would have paid for the units, recognizing what he was getting, which was, by any rational view of the evidence, a probable controversy with other investors in the organization. By that time, there had been at least two lawsuits filed and it did not take a great deal of intuition to discern that other suits were likely to follow. Any purchaser would, at that point, have recognized that his purchase would have resulted in him acquiring, at most, 30% of the voting units and that this interest could, by exercise of the option by the limited partners be diluted to an interest of approximately 22½%. In other words, he would have immediately been in business with others not of his choosing who had control under any interpretation of the facts. Thus, it is clear in the Court's view that the fair market value for the shares was no more than was received for them at the sale.

What was plaintiffs' evidence in relation to the fair market value of the partnership units? As indicated above, Becknell fallaciously valued them only in relation to the value of the underlying lands, without taking into consideration any of the factors which the Court has discussed above. In addition, his lawyer and co-trustee, Charles Matthews, testified that the value of the total of 2,470 units pledged to both of the banks was $2,400,000.00 and, by simple arithmetic, he concluded that the value of 1,235 units was thus $1,200,000.00. However, upon examination by the Court, Mr. Matthews conceded that his estimate of value assumed that the purchaser would acquire over 50% of the total ownership. He testified that his estimate did not take into account the fact that no bidder at either of the sale could be assured of having control nor that the limited partners could, by little more than a stroke of the pen, exercise options that would certainly place the purchaser in a minority position. He obviously also did not take into account the deflationary effect of the controversies that had arisen within the partnership, which, for example, resulted in him holding a meeting with himself without notice to the other limited partners to vote the trust units to purportedly approve the Dauley deal.

The Court finds that the plaintiffs have utterly failed to carry their burden of proving that the sale of the partnership units by First National Bank and Worthen Bank were not commercially reasonable. The Court specifically finds that the sales were held in a commercially reasonable manner and that fair market value was received for the units when all of the relevant factors are considered.

## WAIVER BY BECKNELL

As was pointed out in the facts set forth above, Becknell and his attorneys reached a specific agreement with First National Bank prior to the sale by it. This agreement was set forth in the letter agreement dated January 4, 1979, introduced as Plaintiffs' Exhibit 4.

While there was no agreement with the specificity contained in Plaintiffs' Exhibit 4 in relation to the Worthen sale, as pointed out in the facts set forth above, Becknell and his attorneys were specifically advised of the procedures to be followed and Becknell's attorney, Matthews, replied that his client did not object to the sale, but only reserved the right to redeem the units.

Plaintiffs argue that the law is that a debtor may not waive the requirement that a default sale be held in a commercially reasonable manner, and points to the pertinent provisions of section 9–501(3)(b) of the Code and Connex, supra. What plaintiffs fail to recognize is that both the Code section cited and the Connex case merely provide that a waiver prior to default is not valid. The law clearly is that either a post-default waiver is valid or that a knowledgable debtor may agree that a particular proposed procedure is commercially reasonable. The courts have held that agreements such as the one entered into in this case between the debtor and the secured parties will be given great weight in considering a challenge to the commercial rea-

sonableness of the sale. In *Piper Accept-ance Corporation v. Yarbrough, supra,* the Court said:

> Furthermore, the letter of February 15, 1982, from appellant's (the debtor's) counsel advising appellees to sell the plane arguably makes the question of the commercial reasonableness of the sale immaterial. *See Pine Bluff Production Credit Association v. Lloyd,* 252 Ark. 682, 480 S.W.2d 578.

In the *Pine Bluff Production Credit Association* case, *supra,* the Arkansas Supreme Court clearly held that the question of whether the debtor either agreed to the sale or made the sale caused the question of whether it was commercially reasonable to become immaterial. *In re ZsaZsa Limited, supra,* the Court, after noting that a hearing had been held before a Referee in Bankruptcy at which time all parties had an opportunity to voice any objections to the manner in which the sale was to be held raised "the presumption that the sale is commercially reasonable." 352 F.Supp. at 672.

Probably the landmark decision in Arkansas in relation to the question of whether a debtor can waive the requirement that a commercially reasonable sale be held, or agree that the proposed manner of holding the sale is commercially reasonable, is the case of *Teeter Motor Company v. First National Bank of Hot Springs,* 260 Ark. 764, 543 S.W.2d 938 (1976). In holding that the particular sale involved in that case was commercially reasonable, the Court stated:

> Appellant first "contends that the Agreement for disposal of collateral should have been held invalid by the Trial Court and the Appellee required to give notice [ten days] as provided by Paragraph 13 of the Financing and Security Agreement." Appellant signed the disposal of collateral agreement about nine days after repossession of the cars by appellee. This after default agreement waived all notice of the terms, times, and places of sale of the repossessed automobiles. Our Uniform Commercial Code clearly

contemplates that a debtor can, as here, waive notification of the sale of collateral following default. Ark.Stat.Ann. § 85–1–102(3) (Add.1961); Ark.Stat.Ann. § 85–9–501(1)(3) (Supp.1975); and Ark.Stat. Ann. § 85–9–504(3) (Supp.1975). Such an agreement, reached after default, as here, can result in a quick and efficient disposal of collateral for the benefit of the parties. (260 Ark. 764 at 765–766 [543 S.W.2d 938])

Neither can we agree with appellant's further argument that Teeter, owner of Teeter Motor Company, was coerced into signing the supplemental agreement, which it first refused to do.... Teeter, a business man, had sufficient time to consult with an attorney as to whether he should or should not sign the agreement. We agree with the chancellor that Teeter's testimony is not "anywhere near sufficient to show that he was coerced, forced, or fraud or misrepresentation practiced on him...." (260 Ark. 764 at 765 [543 S.W.2d 938])

As discussed, appellant waived notice of the sale of the cars by the after default agreement for disposal of the collateral ... We agree with the chancellor that the repossession here, in conformity with both statutory authority and the contractual provision, did not constitute a breach of the peace.... (260 Ark. 764 at 767 [543 S.W.2d 938])

Further, the procedure challenged here involved actions between individuals arising out of the express written agreement of these parties.... (260 Ark. 764 at 768 [543 S.W.2d 938])

As indicated, the appellant was in default, the appellee rightfully took possession of the collateral under their financing agreement and then sold the collateral pursuant to a valid after default agreement approved by the Teeter corporation and by the Teeters individually ... (260 Ark. 764 at 767 [543 S.W.2d 938])

There was ample evidence that Teeter had knowledge of the location of the lot where the repossessed cars were being sold, contacted and sent some prospec-

tive buyers to the lot, was notified of the time and place of auctions, and attended same. The cars were offered first at retail sale and not sold until appellee was satisfied with the adequacy of the price. Only after efforts had been made to dispose of the collateral at retail were the automobiles sold at wholesale or at auction. None of the cars were sold until after the agreement for disposal of collateral was signed by the Teeters. (260 Ark. 764 at 768 [543 S.W.2d 938])

The situation of Mr. Becknell in this case was not unlike that of the knowledgable automobile dealer involved in the *Teeter* case. As pointed out above, it should be remembered that Mr. Becknell was a knowledgable investor and, according to his testimony, had a great deal of expertise in matters such as those involved in this case. If anything, the evidence indicates that he was more knowledgable about such matters than any of the bank officers. In addition, during the entire proceedings and even at the sales, he was represented by two prominent Little Rock lawyers with a substantial practice in real estate and investment matters. Becknell's attorneys presented Attorney Matthews as an expert witness on matters such as these, and the Court recognized at the trial and now recognizes that he does have a great deal of expertise in matters such as those involved in this case. He was offered as an expert, and his expert testimony received by the Court. The Court believes that that factor should be taken into account by the Court, and the Court believes that it weighs heavily toward a conclusion that the sales were held in a commercially reasonable manner in view of the undisputed fact that neither Becknell, Bilheimer, or Matthews, all experts, suggested any procedure other than that proposed by each of the banks. Likewise, it is important to the Court that no action was taken by either Mr. Becknell or his attorneys in his behalf to question either of the sales until some 27 months after the sales had been made, finalized, and title to the partnership units transferred.

In short, the Court specifically finds that the sales were held in a commercially reasonable manner and that fair market value was obtained for the partnership units, when all of the factors present at the time are taken into consideration. The Court further finds that even if it could be said that the sales were not commercially reasonable, Mr. Becknell, after default, either waived the requirements of a commercially reasonable sale, or agreed that the sales proposed by each of the banks and the manner of making them was commercially reasonable. The decision of Mr. Becknell and his attorneys in that respect are now binding upon him.

## THE LIMITED PARTNERS ARE NOT LIABLE TO PLAINTIFFS

Plaintiffs contend that the limited partners are liable to plaintiffs because of their collusive agreements not to bid at either the First National Bank or Worthen sales. They cite authority for this proposition, but the Court deems it unnecessary to discuss in any detail the authorities cited. Suffice it to say that the Court finds, without any hesitation, that the grave and serious charges made against the limited partners are totally unwarranted and not supported by any evidence. In this case, as in most cases of this nature, the credibility of witnesses and the Court's ability to view their testimony played an important part. The Court believes that Mr. Becknell who, as pointed out, some 27 months after the sales were made decided that they were bad, tended to remember things in such a manner as to support the position he now takes. To contrast this, two of the limited partners, Deer and Robert P. Light, a Little Rock attorney, testified. The Court finds from their testimony, and from that of Luke Quinn, that the limited partners did not combine and conspire against Mr. Becknell. To the contrary, their attitude was that they would not do anything to in any way obstruct Mr. Becknell's opportunity to hold on to the partnership units owned by the trusts created by his mother.

The Court was particularly impressed with the testimony of Mr. Light. He obviously testified with some discomfort because he had been a close friend of Becknell since early childhood. He testified that they had known each other since they were in kindergarten together, and that each was a participant in the other's wedding. He testified that he still considered himself to be a close friend of Becknell.

In spite of this, and with some obvious pain, he testified that, in effect, Becknell had, because of his financial difficulties, lost sight of the reasons for which the partnership was formed. His testimony was that everyone at the time understood that it was to be formed for the purpose of the partners realizing long-term income, and it was not intended that it be used as a vehicle to sell real estate as contemplated by the Dauley deal.

In contrast to Becknell's position throughout the trial, and his testimony at the trial, that he always considered that he and the trusts had voting control of the partnership, Light testified that very soon after the partnership was formed, he asked Becknell whether he had voting control. His answer was "With your vote and the vote of any other limited partner, I do." Plaintiffs' only rebuttal witness after the defendants closed their case was Becknell, who testified that Light's version of that conversation was incorrect. He said that he told Light that he did have control. As the Court has already indicated, it believes that where control lay at any particular time is not important in deciding the issues raised in this case. The Court points to this to exemplify the credibility questions that arose during the trial. The Court believes Mr. Light's testimony in this respect, and, after weighing the credibility of the testimony of the witnesses, finds defendants' testimony to be more credible.

Light testified that the limited partners' reactions as expressed in the meetings which were held immediately after they learned that the Becknell trust units were to be sold by the banks was to raise the question, "What shall we do, if anything."

He said that the conclusion was that they would not do anything to impair Becknell's opportunity to hold on.

Light and Deer testified that there was no collusive agreement between the limited partners to, in any manner, attempt to wrongfully obtain the partnership units owned by the trusts. The Court believes and finds that that is true. Now, of course, it became another matter when it became obvious that the partnership units were to be sold by the banks and that Becknell had no viable chance to hold on to them. At that time, it was natural for the partners to become concerned that some third party might, at the public sales, purchase the partnership units. This would result in them collectively being in business with someone not chosen by them. For this reason, they very rightfully in the Court's view, bid at the sale to protect their investment, but there is absolutely no evidence to support Becknell's claim that they conspired with either of the banks and with each other to acquire the trust units at less than fair market value.

## CONCLUSION

In view of the Court's ruling set forth above, it is unnecessary to discuss plaintiffs' allegations that the two banks violated the provisions of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, which prohibit manipulative and deceptive conduct in connection with the purchase or sale of securities. There was not one iota of evidence, in the Court's view, to support this claim. Likewise, in view of what the Court has said above, there is no basis whatsoever for awarding the plaintiffs any damages in this case and their claim for such will be denied.

This opinion shall constitute the Court's findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. A judgment will be entered in conformance with this opinion.