No. 82-253

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

PETER A. DULAN, JR.,

Plainitff and Appellant,

-vs-

MONTANA NATIONAL BANK OF ROUNDUP, f/k/a
MINERS & MERCHANTS BANK OF ROUNDUP,

Defendant and Respondent.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, The Honorable
Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Terry L. Seiffert, Billings, Montana

For Respondent:

K. Robert Foster, Lewistown, Montana

Submitted:  January 18, 1983

Decided:  March 24, 1983

Filed: **MAR 24 1983**

_____
Ethel M. Harrison
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Appellant bought Shanon Studios, a Billings photography business, in 1964 and in 1966 incorporated under Shanon Studios, Inc. On June 2, 1971, he executed a promissory note for $7,500 with respondent and as collateral assigned the stock of the corporation.

On May 22, 1972, appellant agreed to sell Shanon Studios, Inc., to Gerald L. Wolfe for $18,000. This agreement contained the following paragraph:

> "4. Unless otherwise agreed in writing, upon failure of Buyers to make payments within 90 days of the dates due hereunder, all amounts paid by Buyers on the above purchase price shall be retained by Sellers as liquidated damages, and this agreement shall thereupon become void, if said Buyers receive written notice of the failure to make said payment due before the said 90th day, Buyers having all rights and obligations accruing from said stock until said event occurs, if at all." (Emphasis added.)

Also, on May 22, 1972, the buyer and seller executed an escrow agreement which appointed the respondent as escrow agent and included the following provision:

> "Upon receiving notice from Peter A. Dulan, Jr., that any other party here undersigned has failed to perform its part of the agreement mentioned above, as set out in Paragraph Number Four, page five of said Agreement, the Escrow Agent at the expiration of ten (10) days from the date of receiving said notice, shall transfer all stock certificates and documents held in this escrow to Peter A. Dulan, Jr." (Emphasis added.)

No representative of the respondent signed this escrow agreement.

On July 22, 1972, appellant executed a renewal promissory note for $7,500. The collateral was listed as "Assign. of note of Shanon Studios stock payments per schedule

-2-

attached."

On October 17, 1972, Wolfe, the appellant, and the vice president of respondent executed an escrow receipt on the standard form wherein the respondent acknowledged receipt of the agreement to sell and the shares of stock. The prior escrow agreement was not listed as being part of the contents of the escrow. The October 17 escrow also contained the following: "Credit payments to: Peter A. Dulan note." Thus, the arrangement was that Wolfe made payments to respondent to discharge his obligations under the agreement to sell the stock and these payments were in turn directly applied to plaintiff's obligation under the $7,500 renewal promissory note.

Early in 1973 pursuant to correspondence between the parties, appellant signed a financing statement granting respondent a security interest in the stock held in escrow. Respondent filed this document with the secretary of state on March 14, 1973. Originally, assignment of the stock was listed on the actual stock certificate. The bank felt that the assignment should be made on a separate document. This transpired even though on July 22, 1972, appellant executed a renewal promissory note in which the collateral was listed as the assignment of the note from Wolfe for his purchase of the business. The assignment of the stock and the assignment of the note evidence two different types of collateral.

On May 6, 1974, respondent sent appellant a letter advising appellant that Wolfe had not made the March and April payments. Consequently, appellant's payments on his note to respondent were delinquent in the amount of $558.88. The total amount still owing on the note was $1,427.44. On

August 21, 1974, respondent sent another letter to appellant by certified mail which stated the following:

> "This letter is to advise you that a demand is being placed on you in the amount of $1,499.38 which is relative to your note of May 22nd, 1972, in the original amount of $7,500.00. This includes principal of $1,427.44 and interest of $71.94. This pays interest through August 31st, 1974, and if not received by that date we will then proceed against the stock certificate consisting of 4995 shares of Shanon Studio stock which you assigned to the Montana National Bank." (Emphasis added.)

The record indicates that appellant received this letter. He responded with a letter dated September 10, 1974, suggesting methods by which Wolfe could meet his payment obligations. Appellant testified that if these suggestions proved ineffective, the respondent should contact him.

On October 3, 1974, respondent sent another letter to appellant by certified mail to the address the previous letter had been sent to, advising appellant that the stock would be advertised and sold on October 17, 1974. The proceeds would be applied to appellant's past-due loan. The record shows that this letter was returned unclaimed. There is conflicting testimony regarding whether the appellant notified the respondent of his change of address. Appellant testified that he had notified an attorney with the firm that represented the respondent.

On about November 14, 1974, the stock was sold to Wolfe, the same person who was buying the stock under the original contract, for the remaining amount due on appellant's note to respondent ($1,590). There was about $8,500 due on the original contract between Wolfe and appellant.

-4-

Appellant indicated at trial that had he known the stock would be sold to satisfy the amount remaining on his note he would have paid it in full.

On December 7, 1977, appellant filed a complaint alleging that respondent breached its fiduciary duty to appellant by fraudulently foreclosing on the stock without notice of such foreclosure. Appellant sought $6,000 in actual damages and $15,000 in punitive damages. Respondent answered denying any breach of fiduciary relationship and alleging that appellant was not entitled to punitive damages.

The District Court dismissed appellant's complaint, finding that respondent acted in good faith in notifying appellant of the foreclosure and sale. From this dismissal, appellant brings this appeal.

Three issues are presented on appeal:

1. Did the respondent breach a fiduciary duty when it foreclosed on the stock?

2. Did the respondent give proper notice of the sale of the stock?

3. Was the foreclosure sale conducted in a commercially reasonable manner?

The appellant contends first that the respondent breached its fiduciary duty to the appellant when it foreclosed on the stock held in escrow. An escrow agent is a fiduciary and cannot breach this confidence to act for its own advantage. Appellant asserts this breach is clear as Wolfe bought the stock in the foreclosure sale for the amount in default. This was substantially less than the amount remaining on the contract between appellant and

Wolfe. The respondent contends that it acted completely within the statutory authority vested in a secured creditor when a debtor defaults.

A security interest is defined as an interest in personal property which secures payment or performance of an obligation. Section 30-1-201(37), MCA. A security interest attaches binding the creditor and the debtor when there is an agreement between the parties that it attach, value is given to the debtor, and the debtor has rights in the collateral. Section 30-9-204(1), MCA. In the present case the security interest attached on June 2, 1971, when the stock was pledged. There was clearly an agreement between the parties that the security interest attach to the stock, the appellant was given credit or an extension thereof, and the appellant owned the stock when attachment occurred. Further, the security interest continued in the collateral notwithstanding the sale to Wolfe. Section 30-9-306(2), MCA.

We also note that the security agreement became binding before the parties entered into the escrow arrangement. The security interest attached on June 2, 1971. The parties entered into the escrow agreement on October 17, 1972. Consequently, the security interest would remain attached to the stock in the escrow account.

Thus, we hold the security interest had attached and remained so while the stock was in escrow. Upon default the respondent acted within its statutory rights to foreclose on the collateral to satisfy appellant's obligation. Section 30-9-504, MCA.

The escrow arrangement was a convenient means to have

payments from Wolfe, for the corporation, credited against appellant's original indebtedness to the respondent. It should not, however, create an obstacle for a secured party in exercising its statutory rights to foreclose on collateral when the debtor defaults. Moreover, the fiduciary duties respondent owed to the appellant, as an escrow agent, did not conflict with this right.

The particular instruction that appellant asserts would require the respondent to return possession of the stock certificate to appellant, if Wolfe defaulted on a payment, was in the May 22, 1972, escrow agreement between appellant and Wolfe. However, the respondent was merely appointed as depository. It had not legally accepted the escrow. Hence, this instruction did not bind the respondent. It was not until October 17, 1972, that respondent legally became the escrow depository. This is evidenced by the formal escrow receipt executed on that date. It acknowlededged receipt of the agreement to sell and the shares of stock. The agreement was on a standard form and made no reference to the May 22, 1972, escrow.

The appellant further asserts that the respondent did not comply with the Uniform Commercial Code in failing to give notice of the foreclosure sale. The respondent argues that in Montana such notice only needs to be sent and, moreover, that the August 21, 1974, letter apprised the appellant of respondent's intentions to proceed against the stock.

Section 30-9-504(3), MCA, provides ". . . reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private

sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . ." (Emphasis added.) Section 30-1-201(26), MCA, defines notice as:

> ". . . taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person 'receives' notice or notification when:
>
> ". . .
>
> "(b) it is duly delivered . . . at any other place held out by him as the place for receipt of such communication."

In James Talcott, Inc. v. Reynolds (1974), 165 Mont. 404, 529 P.2d 352, we specifically held that according to the UCC there is no requirement that the debtor receive actual notice. It requires the creditor to take reasonable steps to assure that the debtor is notified.

We hold that notice of the sale of the stock was proper. Notice was sent to the appellant. Further, the steps taken by the respondent were those reasonably required to notify the appellant of the foreclosure. Also, according to the UCC, the appellant received notice of the sale when it was delivered to the address the August 21, 1974, letter was sent. By responding to that letter, the appellant held the address of delivery out as a place for receiving communications.

Finally, the steps taken by the respondent to notify the appellant were successful in giving actual notice. The August letter informed appellant of the respondent's intentions to dispose of the collateral to satisfy the appellant's obligation.

Finally, the appellant contends the sale of the collateral was not conducted in a commercially reasonable

manner as mandated by section 30-9-504(3), MCA. The respondent merely sold the stock to the original purchaser for an amount substantially less than its worth and the sale was not advertised.

The respondent asserts that the price itself does not warrant a holding that a particular sale was commercially unreasonable. The appellant must prove that the manner of the sale was commercially unreasonable.

Under the UCC, every aspect of the foreclosure proceedings, including method, manner, time, place and terms, must be commercially reasonable. Section 30-9-504(3), MCA. The fact that a better price could be obtained at a different sale or a different method or manner of disposition does not establish that the sale was commercially unreasonable. Section 30-9-507(2), MCA.

This Court interpreted these two sections of the UCC in the Talcott case, supra. We held that the reasonableness of the sale is not determined by price but the manner in which the sale was conducted. In other words, if the sale is considered commercially reasonable, then the price is reasonable.

However, Professors White and Summers in their treatise on the UCC place some importance on the price that was actually received for the collateral. They state:

> ". . . Notwithstanding the statement in 507-(2) that low resale price alone is not enough, the crucial issue which one gleans from the 'method, manner, time' language and from the several cases interpreting 9-504(3) is just that--was the price sufficient? The debtor who asks a court to ignore 9-507(2) probably expects too much, but the cases suggest that given an unusually low resale price little more is needed for the courts to find the sale commercially unreasonable

. . ." White and Summers, Uniform Commercial Code 2d Ed., § 26-11 at 1116 (1980).

Some recent cases recognize that the resale price should be a factor in determining the commercial reasonableness of a sale. In Mercantile Financial Corporation v. Miller (E.D. Pa. 1968), 292 F.Supp. 797, 7 UCC 402, the court recognized that:

> "Although § 9-507(2) clearly provides that a discrepancy between a price received by a creditor disposing of assets pursuant to § 9-504 and an isolated price later shown to have been obtainable, is not alone sufficient to grant a debtor affirmative relief under § 9-507(1), certainly such a discrepancy, if substantial, is relevant to a determination of whether a challenged sale was 'commercially reasonable'. [citing cases] The evidence here established that the price received for the goods sold by the plaintiff [secured party] was substantially less than both the price originally paid for them by G.F.&M. and the price which the purchaser of the assets subsequently received for them on resale, i.e., approximately $57,000.00. This evidence strongly suggested that the plaintiff did not obtain the fair market value for these goods at the time of the sale, and the plaintiff did not rebut this inference." 292 F.Supp. at 801.

Thus, in light of the above authority and the fact that "reasonable price" is the objective of a commercially reasonable disposition, we hold that a large discrepancy in price can be considered within the parameters of section 30-9-504(3), MCA. We also conclude that the complaining party has the burden of proving the price received was less than the fair market value of the collateral.

In this case, besides the evidence regarding the value of the stock, the appellant made little effort to prove the actual sale was commercially unreasonable. The record is replete with speculations of the value of the stock when it

-10-

was disposed. The appellant asserted that the assets of the corporation were valued at $22,279.79 the year before the sale of the collateral. However, there was also testimony that Wolfe did not do well with the business after the appellant sold it to him. Moreover, Wolfe filed corporate bankruptcy approximately two and one-half years after it was sold.

Thus, we hold that the appellant did not prove that the sale was conducted in a commercially unreasonable manner pursuant to section 30-9-504(3), MCA. We further hold that there is substantial evidence to support the lower court's conclusion that appellant did not meet his burden of establishing that the stock was worth an amount greater than that for which it was sold.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

-11-