No. 90-099

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

WALEN F. LILLY,
        Plaintiff and Respondent,

    -v-

FRED TERWILLIGER, CLARA TERWILLIGER,
JAMES BONNETT, and DEBORAH BONNETT,
        Defendants and Appellants,

    and

JAMES BONNETT and DEBORAH BONNETT,
    Defendants and Counter-plaintiffs,
    Appellants

    -v-

WALEN F. LILLY,
    Counter-defendant/Respondent.

**FILED**

JUL 24 1990

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                In and for the County of Gallatin,
                The Honorable Frank Davis, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Pierre L. Bacheller; Billings, Montana

        For Respondent:

            Donald E. White; Bozeman, Montana

                        Submitted on Briefs:   June 7, 1990

                                    Decided:  July 24, 1990
Filed:



_____
                    Clerk

Justice John C. Harrison delivered the Opinion of the Court.

James and Deborah Bonnett, defendants and counter-plaintiffs below, appeal the judgment issued by Judge Frank Davis, sitting in the Eighteenth Judicial District, Gallatin County. The District Court held that plaintiff and counter-defendant Walen "Bud" Lilly's sale of repossessed property was commercially reasonable and Lilly was entitled to a deficiency judgment, but, because Lilly's notice of the sale to the Bonnetts did not comply with the strict requirements of foreclosure on collateral statutes, the District Court effected an adjustment by way of set off as to the deficiency judgment. We affirm.

Three issues are presented for review:

1. Did the trial court err in concluding that the Notice of Repossession was defective?

2. Did the trial court err in concluding that the sale of repossessed collateral was commercially reasonable?

3. Did the trial court err in calculating the dollar amount to which Lilly was entitled by judgment?

In 1952, Walen "Bud" Lilly started a fishing shop in West Yellowstone, Montana. Over the years "Bud Lilly's Trout Shop" became known nationally and internationally. With this reputation the business prospered, grossing over $600,000 in 1981. In January of 1982, Bud Lilly and his family sold the shop to two couples, Fred and Clara Terwilliger and James and Deborah Bonnett, for $275,000, allocated as follows:

| 1. | Inventory | $ 93,767.00 |
| 2. | Fixtures and Physical Assets | $ 30,539.10 |
| 3. | Covenants not to compete | $ 5,000.00 |
| 4. | Guide deposits | $ 200.00 |

| 5. | Accounts receivable | $ | 493.90 |
| 6. | Goodwill, consisting of Bud Lilly's Trout Shop, all guide licenses, all outfitters' licenses, all special use permits for the State of Montana, State of Idaho and Yellowstone National Park and the 1982 mailing list | $ | 145,000.00 |
| | | TOTAL | $ 275,000.00 |

Each couple contributed $25,000 for a total down payment of $50,000. The balance of the purchase price of $225,000 plus interest at the rate of 12% per annum was to be paid over a twenty-year period in monthly installments of $2,477.52. An addendum to the contract raised the monthly payments to $2,599.62 to account for the interest accrued from the date the parties entered the agreement to the date of the first payment. The Terwilligers and Bonnetts executed a promissory note for the balance of the contract along with a security agreement and financing statements. The financing statements were filed with the Secretary of State and subsequently the statements were continued.

Within a few months, the Terwilligers and Bonnetts experienced management differences. In October 1982, the Terwilligers bought out the Bonnetts' interest in the business for $34,100. James Bonnett testified that the decision to sell out was purely monetary because the business could not support both the Bonnetts and Terwilligers. At the time that the Terwilligers bought them out, the Bonnetts attempted to obtain a release of liability from Lilly. Lilly refused to grant the Bonnetts a release from liability without a pledge by the Terwilligers of additional collateral or provision of an alternative means of securing the unpaid balance

3

on the promissory note.

Terwilligers stopped making payments in the fall of 1986. Lilly sent Notice of Default on December 9, 1986 and Notice of Acceleration on January 27, 1987 to both the Bonnetts and Terwilligers. Additionally Bud's son, Michael Lilly, a Montana attorney, wrote the Bonnetts a letter on February 2, 1987 stating that Fred Terwilliger had not responded to either notice and reminding the Bonnetts they had not been released from their obligation to Bud Lilly.

Bud Lilly took the business back in March, 1987. On March 30, 1987, Lilly sent a Notice of Repossession to both couples, informing them that a sale of "inventory, fixtures, and equipment" to James Criner for $60,000 was contemplated. Neither party made objection to the sale. However, the notice made no mention of the sale of the name "Bud Lilly's Trout Shop, Inc.," the goodwill, the covenant not to compete, the mailing list, and the outfitter's and guide's licenses. Lilly sold the business to Criner for $60,000. Lilly then filed a complaint on May 26, 1987 in an effort to collect the amount remaining unpaid by the Bonnetts' and Terwilligers' breach of contract. The defendants answered, asserting as an affirmative defense that Lilly's sale to Criner was commercially unreasonable because proper notice was not given that all assets would be sold, and Lilly was therefore not entitled to a deficiency judgment.

Trial was had before Judge Davis, sitting without a jury. The Terwilligers, who filed for relief under Chapter 7 of the U.S.

4

Bankruptcy Code, were dismissed from the suit by stipulation. The trial court found that Lilly's sale to Criner was commercially reasonable although flawed by a procedural technicality of proper notice. The trial court concluded Lilly was entitled to a judgment of $217,000 less an offset of $145,000 for the value of the business' goodwill, for an aggregate judgment of $72,000 with interest.

Defendants James and Deborah Bonnett now appeal from this judgment.

> Issue 1: Did the trial court err in concluding that the notice of repossession was defective?

Lilly, in accordance with the terms of the sales agreement, sent Notice of Default to both the Bonnetts and Terwilligers after they missed two monthly payments in the fall of 1986. When neither of the buyers cured the default, Lilly, again according to terms of the agreement, sent them both a Notice of Acceleration which provided the Terwilligers and Bonnetts fifteen days to pay the entire balance owing of $220,700.85. Receiving no response to either the Notice of Default or the Notice of Acceleration, Lilly finally sent each buyer a Notice of Repossession which stated:

> PLEASE TAKE NOTICE and you are hereby notified that on the 21st day of March, 1987, the undersigned took possession of all inventory, fixtures and equipment conveyed by that certain Sales Agreement dated the 30th day of January, 1982, wherein The Trout Shop, Inc. is named as seller and you are named as buyer, and pursuant to Section 30-9-502 MCA.
>
> The sale of said inventory, fixtures, and equipment is contemplated by the undersigned pursuant to Section 30-9-504 MCA. James

Krinner [sic] has offered to purchase said property for the sum of $60,000.00. You are requested to notify the undersigned's counsel, Michael J. Lilly, at 222 East Main Street, Suite 301, Bozeman, Montana, 59715, of your objection to said purchase of inventory, fixtures and equipment within five (5) days of the date of this notice.

DATED this 30th day of March, 1987.

_____/s/_____
WALEN F. LILLY

The Bonnetts contend that they made no objection to the proposed sale because the Notice of Repossession made no mention of the proposed sale to Criner of the covenant not to compete, the goodwill, the name "Bud Lilly's Trout Shop, Inc.," licenses, and mailing list. The notice advised only that Lilly contemplated a sale of the "inventory, fixtures and equipment" for $60,000.00.

The trial court found that

> Lilly made little or no effort to find a buyer other than Criner, but he advised Bonnett as to that potential, e.g., a sale of only the "inventory, fixtures and equipment." There was no evidence that Bonnett would have objected to the proposed sale as being commercially unreasonable, or any inquiry as to what was to be done with the principal asset--the goodwill, valued in 1982 by both seller and buyers, at $145,000!! Bonnett knew of his potential liability for a deficiency. It was incumbent upon him to at the very least make an inquiry about a $145,000 asset.

The Uniform Commercial Code addresses notice requirements for a sale at § 30-9-504(3)(a), MCA:

> Disposition of the collateral may be by public or private proceedings . . . reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party

6

to the debtor.

This Court, quoting from the official U.C.C. comment to § 30-9-504, MCA, previously recognized that the purpose of the notice requirement is to ensure that "[p]ersons entitled to receive it will have sufficient time to take appropriate steps to protect their interests by taking part in the sale or other disposition if they so desire." Wippert v. Blackfeet Tribe (1985), 215 Mont. 85, 89, 695 P.2d 461, 464.

The notice that Lilly sent to the Bonnetts met all the requirements of § 30-9-504, MCA, giving the Bonnetts reasonable notification of the time after which the private sale was to have been made. In fact, the notice went beyond the statutory requirements by including the name of the prospective buyer and the intended selling price. Moreover, the notice met its stated purpose, that is, to give the Bonnetts an opportunity to protect their interests by taking part in the sale if they so desired. As the trial court noted, Bonnetts knew of their potential liability for a deficiency and should have inquired about the $145,000 goodwill asset when they received the Notice of Repossession.

The promissory note executed by the Bonnetts and Terwilligers was secured by a security agreement. The security agreement listed inventory, fixtures and equipment as the collateral pledged. The financing statement filed with the Secretary of State listed the covered collateral as "All inventory and fixtures, and additions thereto." Nowhere in either the security agreement or financing statement were the licenses, covenant not to compete, mailing list,

goodwill, or the name "Bud Lilly's Trout Shop" listed as collateral.

The trial court agreed that the licenses, covenant not to compete, mailing list, goodwill and name were not specifically secured by the security agreement and financing statement. The trial court did find, however, that such property was secured collateral under the Sales Agreement.

The Uniform Commercial Code specifies the conditions necessary to a security interest:

> (1) . . . a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
>
> (a) the collateral is in the possession of the secured party pursuant to agreement or the debtor has signed a security agreement which contains a description of the collateral . . .
>
> (b) value has been given; and
>
> (c) the debtor has rights in the collateral.

Section 30-9-203(1), MCA.

Because the Sales Agreement does not contain a description of the licenses, covenant not to compete, mailing list, goodwill, or name as collateral it fails to meet the requirements of subsection (1)(a), of § 30-9-203, MCA, for creating a security interest. A provision in the Sales Agreement clearly identifies Lilly's security as the seller:

> 9. Seller's Security. It is understood and agreed that Buyer shall execute a promissory note and Security Agreement in favor of Seller and its assigns for the unpaid

8

> balance of the purchase price. Said Security
> Agreement shall designate the <u>inventory and
> fixtures, and any additions thereto, as
> collateral</u> for the unpaid purchase price. . .
> (Emphasis added.)

The licenses, covenant not to compete, mailing list, goodwill, and name "Bud Lilly's Trout Shop" are not collateral under the U.C.C. and are, therefore, not subject to the notice requirements of § 30-9-504(3)(a), MCA.

We find that the Notice of Repossession was not defective. The trial court's finding that the notice was flawed was erroneous. In light of the fact that Lilly does not contest the trial court's decision to effect an adjustment by way of a setoff, the error was harmless.

> Issue 2: Did the trial court err in concluding
> that the sale of repossessed collateral was
> commercially unreasonable?

The trial court found that the Bonnetts' evidence that the Criner sale was not commercially reasonable was not persuasive. The Bonnetts presented two owners of fly fishing businesses in West Yellowstone who gave their expert opinions that the Bud Lilly Trout Shop was worth more than the $60,000 Criner paid for it. Lilly presented testimony from his son, Gregory, who operates a similar business in Bozeman. Gregory testified that although he had earlier expressed an interest in the business, at the time his father repossessed Bud Lilly's Trout Shop it was in such a state that Gregory thought $60,000 was too much to pay. The trial court noted neither of Bonnetts' experts knew the distressed state of Bud Lilly's Trout Shop in April, 1987; only Lilly and Criner knew that

in less than six years the business, through bad management and nonmanagement, had declined from a $600,000 annual gross income business to a point where the buyers could not even make relatively modest payments. The court found that under the circumstances the sale to Criner was commercially reasonable.

Lilly, as the secured party, carries the burden of proving that his disposition of the collateral was commercially reasonable. Bank of Sheridan v. Devers (1985), 217 Mont. 173, 176, 702 P.2d 1388, 1390 (quoting Farmers State Bank v. Mobile Homes Unlimited (1979), 181 Mont. 342, 347, 593 P.2d 734, 737). However, this Court will not disturb the findings of the trial court unless such findings are "clearly erroneous." Rule 52, M.R.Civ.P.; Farmers State Bank, at 350, 593 P.2d at 738.

Bonnetts argue that the sale was commercially unreasonable because Lilly held a private rather than a public sale, Lilly did not advertise the sale or solicit bids, Lilly did not have the business appraised, and the $60,000 sale price was inadequate. Bonnetts were apprised of the private sale, including the identity of the buyer and the purchase price, well in advance of the sale. Bonnetts made no objection to the private sale after receiving the notice.

The U.C.C. dictates that every aspect of the disposition of collateral, including the method, manner, time, place and terms must be commercially reasonable. Section 30-9-504(3), MCA. The fact that a better price could have been obtained by a sale at a different time or in a different method does not in itself

establish that the sale was commercially unreasonable. Section 30-9-507(2), MCA.

This Court has previously interpreted these two sections to mean that the "reasonableness of the sale is not determined by price but the manner in which the sale was conducted. In other words if the sale is considered commercially reasonable, then the price is reasonable." Dulan v. Montana Nat'l Bank of Roundup (1983), 203 Mont. 177, 185, 661 P.2d 28, 32.

After some discussion the Dulan Court went on to state that a discrepancy in price can nonetheless be considered to be within the parameters of § 30-9-504(3), MCA, and that the burden of proving that the price received was less than the fair market value of the collateral falls on the complaining party. Dulan at 186, 661 P.2d at 32.

The evidence of the complaining party herein falls short of its burden. The Bonnetts were advised of the private sale yet made no objection. As to Lilly's failure to advertise, solicit bids, or secure an appraisal, testimony indicated that because the fishing season was imminent, it was important for Lilly to act quickly. Finally, as to the price Lilly received for the business, as the trial court noted, the state of business was such that the Terwilligers could not even make relatively modest payments. In light of this evidence, the $60,000 price Criner paid is reasonable.

We agree with the trial court that Bonnetts' evidence that the Criner sale was not commercially reasonable was not persuasive.

11

We hold that the Bonnetts did not prove that the sale was conducted in a commercially unreasonable manner pursuant to § 30-9-504(3), MCA. There is substantial evidence to support the trial court's conclusion that Bonnett did not meet his burden of establishing that Bud Lilly's Trout Shop at the time of sale to Criner was worth more than the price for which it was sold.

> Issue 3: Did the trial court err in calculating the amount to which Lilly was entitled by judgment.

The trial court concluded that the amount of deficiency judgment should be determined as follows:

```
Amount due on unpaid portion
        of promissory note:          $217,000
Less offset for price of goodwill:  ($145,000)
```

Total amount of deficiency judgment:  $72,000

Bonnetts take issue with the trial court's calculations in two respects. First, Bonnetts assert that the amount remaining unpaid on the promissory note as reflected in the escrow ledger is $214,000 rather than $217,000. Secondly, Bonnetts suggest that the court failed to credit them for the amount Lilly received for resale of the assets to Criner.

Lilly notes that he does not agree with the offset for goodwill, but elected not to appeal that issue.

The amount of the deficiency judgment appears to have been arrived at as follows:

```
Amount due 01-27-87                                        $220,700.85

Amount Due on 04-13-87 (date of first
   Criner payment) (108 days)
   $220,700.85 + (108/365) ($220,700.85) (.12)     228,573.24
```

| | |
|---|---|
| Credit for First Criner Payment ($20,000.00) | (20,000.00) |
| Amount Due After First Criner Payment | 208,573.24 |
| Amount Due on 10-01-87 (date of second<br>Criner payment) (170 days)<br>$208,573.24 + (170/365) ($208,573.24) (.12) | 220,230.48 |
| Credit for Second Criner Payment ($10,000.00) | (10,000.00) |
| Amount Due on 10-01-88 (date of third<br>Criner payment (365 days)<br>$210,230.48 + (365/365) ($210,230.48) (.12) | 235,458.13 |
| Credit for Third Criner Payment ($30,000.00) | (30,000.00) |
| Total Due After Third & Final Criner Payment | 205,458.13 |
| Total Due on 04-21-89<br>(171 days)<br>$205,458.13 + (171/365) ($205,458.13) (.12) | 217,008.81 |

Thus, the price paid by Criner has been credited and $217,000 is the correct starting figure. We find no error in the trial court's calculations.

We affirm.

_John Conway Harrison_
Justice

We concur:

_P. C. McGoruey_

_John L. Sheehy_

_L. E. Libra_

13

_____
Justices

14